**STATECRAFT**
LAW · GOVERNMENT · CRISIS MANAGEMENT

649 North Fourth Avenue, First Floor
Phoenix, Arizona 85003
(602) 382-4078

Kory A. Langhofer, Ariz. Bar No. 024722
kory@statecraftlaw.com
Thomas Basile, Ariz. Bar No. 031150
tom@statecraftlaw.com

*Attorneys for Defendant Donald J. Trump
for President, Inc.*

Timothy A La Sota, Arizona Bar No. 020539
**TIMOTHY A. LA SOTA, PLC**
2198 East Camelback Road, Suite 305
Phoenix, Arizona 85016
(602) 515-2649
tim@timlasota.com

*Attorney for Defendant Arizona Republican Party*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Democratic Party,<br><br>Plaintiff,<br><br>v.<br><br>Arizona Republican Party, Donald J. Trump for President, Inc., Roger J. Stone, Jr., and Stop the Steal, Inc.,<br><br>Defendants. | Case No. CV-16-03752-PHX-JJT<br><br>**DEFENDANTS ARIZONA REPUBLICAN PARTY AND DONALD J. TRUMP FOR PRESIDENT, INC.'S RESPONSE TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>(Assigned to the Honorable John J. Tuchi) |

## INTRODUCTION

Citing opaque remarks in public speeches by political candidates as the basis for four cookie-cutter lawsuits filed across the country to garner headlines and cause chaos in the

1

efforts of their political opponents, state Democratic Party organizations have brought to this Court and three others an emergency request that the Court prohibit hypothetical political conduct, by unidentified persons, that allegedly will improperly dissuade other unknown persons from voting. These filings are based on miscellaneous long-ago statements, vague innuendo, rank speculation, and a heavy dose of rhetoric—all geared solely toward creating political mayhem rather than preventing actual misconduct. For the reasons detailed below, this Court should deny Plaintiff's Motion for A Temporary Restraining Order and Preliminary Injunction—a request that is as misguided as it is sweeping.

It is misguided because the Plaintiff at bottom seeks an injunction requiring that the Defendants follow Arizona and federal election rules on Election Day—this despite the fact that federal courts will not typically issue "obey-the-law" injunctions absent compelling evidence that the law will not otherwise be followed. *See N.L.R.B. v. U.S. Postal Serv.*, 486 F.3d 683, 691 (10th Cir. 2007). And it is sweeping because any order adopting the Complaint's numerous requests for relief threatens to dissuade Arizonans from exercising their bedrock rights to political speech and political organizing.

As a legal matter, the Complaint fails even the most basic requirements for seeking emergency injunctive relief. *First*, the Complaint cites no actual acts of "voter intimidation" attributable to Arizona Republican Party ("ARP") or Donald J. Trump for President, Inc. (the "Campaign"), even with voting by mail and ballot drop-offs commencing over two weeks ago. On that ground alone, the Complaint fails to demonstrate a high probability of actual or likely harm justifying injunctive relief.

Perhaps sensing this deficiency, Plaintiff relies heavily on the supposed activities of another person and another entity—one Roger Stone and his group "Stop the Steal." *See* Complt. ¶¶ 1, 9, 33-38, 42, 58, 62-63, 71-73. But Mr. Stone and his group are completely independent from the ARP and the Campaign and there is no basis in fact or law for ascribing or imputing their activities to the ARP or the Campaign. Mr. Stone and his

STATECRAFT
LAW · GOVERNMENT · CRISIS MANAGEMENT

organization are not employed by or affiliated with the ARP or the Campaign in any way. The ARP and the Campaign have no knowledge of Mr. Stone and Stop the Steal's activities. Nor did they direct, control, authorize, approve, or consent to any of the statements or actions Mr. Stone and Stop the Steal are alleged to have undertaken. Plaintiff conclusorily calls Mr. Stone a "longtime associate of Trump's," Complt. ¶ 9, but that vague allegation— even if true—is plainly not enough to establish the sort of nefarious conspiracy Plaintiff imagines.

*Second*, Plaintiff's proposed remedy threatens to undermine the political and speech rights afforded Defendants, and all Arizonans, by Arizona law and the United States Constitution. Arizonans enjoy the right to political speech, as well as the right to volunteer for their preferred political party, among other election-related rights. Yet, Plaintiff would have the Court issue a broad, vaguely worded order that threatens to restrain this protected political engagement. Given the lack of evidence of actual illegal conduct in the Complaint, it is impossible to know how broadly Plaintiff's requested relief would extend, and thus what protected political conduct would be swept up under the order, in disregard of both state law and the First Amendment.

For these and other reasons explained below, Plaintiff cannot satisfy its burden to prove a right to extraordinary emergency relief. Accordingly, the motion should be denied.

## ARGUMENT

A preliminary injunction is "'an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Ctr. for Competitive Politics v. Harris*, 784 F.3d 1307, 1311–12 (9th Cir. 2015) (quoting *Winter v. NRDC,* 555 U.S. 7, 20 (2008)). Plaintiff's motion fails at every step.

# I. Plaintiff Cannot Show That Anyone Will Be Irreparably Harmed by the Court's Refusal to Award a Temporary Restraining Order.

This analysis begins with the second part of this four-factor test, because the relevant facts illustrate just how frivolous this case is. There is no evidence—none—that Plaintiff's imagined harms will come to pass in Arizona.

Plaintiff's request for emergency relief rests upon an alleged conspiracy among the ARP, the Campaign, and others to "threaten, intimidate, and thereby prevent" voters from voting in the 2016 election. Complt. ¶ 1. Given the serious nature of these allegations—that one of our State's two venerable political parties is actively seeking to deny Arizonans their fundamental right to vote—one would expect firm evidence supporting such allegations. But that evidence is nowhere to be found in 24 pages of briefing.

## A. The Plaintiff's Alleged Injury Is Not Traceable to the Campaign.

As a threshold matter, the Plaintiff lacks any factual or legal basis for obtaining injunctive relief against the Campaign. The process of identifying, appointing and training poll observers is entirely the province of political parties in Arizona. *See generally* Ariz. Rev. Stat. § 16-590 (observers are appointed by the county chairman of each party). The Campaign has had no knowledge of, or involvement in, the formulation or implementation of the ARP's processes and practices with respect to its poll observer program. To secure an injunction, "[p]laintiffs must show themselves to be 'under threat of suffering 'injury in fact' that is . . . fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1171 (9th Cir. 2011). Even if the putative harms asserted by the Complaint are true, they are not causally attributable to the Campaign, and any injunctive order requiring the Campaign to cease activities it has never undertaken and has no intention of undertaking in Arizona would be a practical nullity. "[A]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 142 (2010), particularly when, as here, it is entwined with acute First Amendment concerns and sensitive political

4

dimensions; it cannot serve as a broad prophylactic binding a party that has not participated, and will not participate, in any of the activities and occurrences alleged in the Complaint.

**B.      Plaintiff Has Provided No Evidence of Injury to Any Person.**

The principal source of Plaintiff's "evidence" is a handful of stray comments cherry picked out of media reports covering hundreds of hours of campaign speeches by the Republican Presidential and Vice-Presidential candidates.   Setting aside the obvious evidentiary issues with such an offer of proof—and the fact that these speeches by and large were not given in Arizona, did not reference Arizona, and did not urge any specific conduct in Arizona—nothing in those speeches can justify an extraordinary judicial order restricting quintessential political conduct.   The speech at issue includes general references to campaign volunteers "watching" polling places, *id.* ¶¶ 25, 32, encouragement to supporters to "be involved" in the campaign, *id.* ¶ 29, invitations to supporters to participate in the election to ensure it is not "stolen," *id.* ¶ 27, and questions regarding the possibility of election fraud, *id.,* a notion that enters the political vernacular (and process on occasion) *every* election season. *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J.) (explaining that states have a valid interest "in deterring and detecting voter fraud").   On its face, none of this amounts to express direction that Arizonans engage in forms of "voter suppression," or "vigilantism," Complt. ¶¶ 43–44—an unfortunate, inflammatory characterization that serves only to prop up the Plaintiff's media strategy and invoke heated reactions by those on all sides of the political arena.

Plaintiff's other "evidence" is even more specious.  Plaintiff relies on an anonymous hearsay quote from an "unnamed official" regarding alleged voter suppression.  Complt. ¶ 1.  It cites statements urging supporters to serve as "poll watchers," *id*. ¶¶ 24–25, 28, also known as poll observers, a long-standing practice used by both parties and sanctioned by Arizona law.  *See* Ariz. Rev. Stat. § 16-590 (each county political party chairman "may, for each precinct. . .designate a party agent or representative").  Plaintiff suggests a nefarious motive in the ARP and Campaign seeking volunteers in urban areas like Phoenix and

Philadelphia, *see* Complt. ¶¶ 26–27, 30, 37, yet fails to acknowledge the obvious—that these are the largest cities with the largest concentration of voters in states critical to the outcome of the Presidential election. And Plaintiff strains to impute nebulous unlawful connotations to the prospect that many voters and observers may wear red-colored clothing to the polling place, Complt. ¶ 35.

Nor do past elections furnish any cause to anticipate any material incidence of voter intimidation. The Arizona Democratic Party's research director and election protection coordinator during the 2012 general election acknowledged to media outlets at the time that although "the party was investigating a few minor incident involving poll watchers. . .there weren't nearly as many problems as expected." Natasha Khan & A.J. Vicens, "Despite concerns, no reports of problems with Arizona poll watchers," CRONKITE NEWS, Nov. 6, 2012, *available at* http://cronkitenewsonline.com/2012/11/despite-advocates-concerns-no-reports-of-problems-with-arizona-poll-watchers/.

Compare this thin record to that assembled in *Daschle v. Thune*, the lone case Plaintiff cites to justify the granting of a TRO. *See* Motion at 10–11 (citing Temporary Restraining Order, *Daschle v. Thune*, No. 04-cv-4177, Dkt. No. 6 (D.S.D. Nov 2. 2004). There, the TRO was issued only after the plaintiff there presented express evidence—including "[o]ral testimony" and "photographs," *id.* at 1—revealing that individuals were "follow[ing] Native Americans from the polling places," "copy[ing] [their] license plates," and recording "the license plates of Native Americans driving away for the polling places." *Id.* at 2. Nothing similar—or even in the same ballpark—has been shown here.

Perhaps best illustrating the weakness in Plaintiff's case is its reliance on stray remarks from Twitter and similar platforms. *See* Complt. ¶¶ 34, 56, 62. This patchwork of comments came from non-parties who are not controlled by, and have no discernible connection to, the ARP or the Campaign. Needless to say, they have no relevance to the question whether *these* defendants will irreparably harm anyone. (Nor is there precedent for Plaintiff's requested remedy in this context. After all, if every social-media comment

could serve as the basis for injunctive relief against affiliates of the speaker, our courts would be drowning in cases.)

In the end, Plaintiff's claims rest on rhetoric, not evidence. This deficiency is particularly surprising given that Plaintiff filed its motion knowing the burden it faces in this setting, as well as the extraordinary nature of the relief it seeks. It is also telling. Early voting and ballot drop-offs at county elections officers have been ongoing for some two weeks—more than enough time for the harms threatened in the Complaint to materialize. Yet nothing untoward has transpired, as evidenced by the dearth of evidence in the Complaint. On this record, there is no basis for awarding the extraordinary remedy Plaintiff seeks and injecting this Court into Arizona's electoral process.[1]

## II. Entering a TRO Would Substantially Harm Third Parties, Thereby Undermining The Public Interest.

Plaintiff's request for emergency relief should also be denied because the issuance of a temporary restraining order would cause substantial harm to non-parties, and would be contrary to the public interest. *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009) ("If . . . the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the district court grants the preliminary injunction.").

### A. The Motion Seeks Impermissible, Content-Based Restrictions on Political Speech.

Because democracy depends upon the free exchange of ideas, the First Amendment forbids laws "abridging the freedom of speech." U.S. Const., Am. 1. Political speech "is at the core of what the First Amendment is designed to protect." *Morse v. Frederick*, 551 U.S. 393, 403 (2007). The Supreme Court has thus long interpreted that Amendment as "afford[ing] the broadest protection to such political expression in order 'to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired

---

[1] The Complaint also includes allegations against other defendants. Those parties are not associated with the ARP or Donald J. Trump for President, Inc. Nonetheless, Plaintiff's claims against those defendants fail for many of the reasons articulated here—including a lack of factual support.

7

by the people." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995) (quoting *Buckley v. Valeo*, 424 U.S. 1, 14–15 (1976) (per curiam)).

The Complaint relies on numerous statements that are unambiguously protected political speech. *See, e.g.*, Complt. ¶ 22 ("The only way we can lose, in my opinion—and I really mean this, Pennsylvania—is if cheating goes on."); *id.* ¶ 23 ("You've got to get everybody to go out and watch, and go out and vote."). As Plaintiff is well aware, candidates are perfectly within their rights to encourage their supporters to serve as poll watchers. *See, e.g.*, Join Victory Counsel, HILLARY FOR AMERICA (last visited Oct. 31, 2016), https://perma.cc/MV9U-35QP ("Volunteer to protect the vote as a poll observer this election cycle."). And supporters of opposing candidates are perfectly within their rights to debate whether an election is at risk of being "rigged" because of voter fraud. However upsetting or deplorable the Plaintiff may find these views, it cannot restrict them. "As a Nation we have chosen a different course—to protect even hurtful speech on public issues to ensure that we do not stifle public debate." *Snyder v. Phelps*, 562 U.S. 443, 461 (2011). It is hard to imagine a court order more inimical to the public interest than one aimed at chilling a candidate's or citizen's political speech.

Nonetheless, based on statements like those noted above, Plaintiff asks the Court to issue vague injunctions forbidding "harassment or intimidation of voters," defined to include, among other things, "suggestions of legal or criminal action" and "'citizen journalist' initiatives.'" Complt. Prayer for Relief (a), (b). The trouble with these proposed injunctions—apart from their dubious legal foundation—is their potential breadth. Intimidating voters is illegal, and neither the ARP nor the Campaign remotely condones such conduct. But Plaintiff has tried to claim that all sorts of innocuous, entirely legal conduct constitutes "intimidation"—conduct such as protesting against a candidate on a sidewalk several hundred feet from a polling place; "suggest[ing]" that a co-worker believed to be voting illegally may be subject to "legal or criminal action;" or even simply asking fellow citizens for whom they voted. Complt. Prayer for Relief (a).

Plaintiff's sweeping request for relief thus runs roughshod over the First Amendment. As an initial matter, the TRO that Plaintiff proposes is entirely lacking in specificity; it seeks, in essence, an order directing Defendants and others to "obey the law." But "[i]njunctions that broadly order the enjoined party simply to obey the law and not violate the statute," *N.L.R.B.*, 486 F.3d at 691, are disfavored, though not *per se* forbidden, *see MDY Indus., LLC v. Blizzard Entm't, Inc.*, CV-06-2555-PHX-DGC, 2009 WL 649719, at *1 (D. Ariz. Mar. 10, 2009) ("'[B]lanket injunctions to obey the law are disfavored."); *F.T.C. v. EDebitPay*, *LLC*, 695 F.3d 938, 944 (9th Cir. 2012). That is so because such injunctions "often lack the specificity required by Rule 65(d)." *S.E.C. v. Goble*, 682 F.3d 934, 950 (11th Cir. 2012); *see* Fed. R. Civ. P. 65(d) (requiring that every temporary restraining order and injunction "state its terms specifically"). That "Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). Temporary restraining orders should thus "be phrased in terms of objective actions, not legal conclusions." *Goble*, 682 F.3d at 950 (internal quotation marks omitted).

This is particularly critical in the speech context. Injunctions "carry greater risks of censorship and discriminatory application than do general ordinances." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 764 (1994). Courts thus interpret the First Amendment to permit speech-restricting injunctive relief "only if there is a showing that the defendant has violated, or imminently will violate, some provision of statutory or common law." *Id*. at n.3. As explained above, the supposed legal violations are based on pure speculation. Further, even content-neutral injunctions must "burden no more speech than necessary to serve a significant government interest." *Id*. at 765. Yet Plaintiff has made no effort to show that the exceptionally broad relief it seeks "burdens no more speech than necessary" to serve a significant government interest. In addition, the proposed injunctions here *are* content-based, since the Plaintiff is seeking to "draw[] distinctions based on the message a

speaker conveys," *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015)—it asks the Court to declare citizens free to speak "around polling places," but only if they do not convey certain messages. Because the injunction is content-based, it is subject to strict scrutiny—a standard the Plaintiff plainly cannot satisfy given that it cannot even satisfy the lesser standard that applies to content-neutral injunctions.

The "First Amendment embodies our choice as a Nation that, when it comes to [political] speech, the guiding principle is freedom—the unfettered interchange of ideas." *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 750 (2011) (internal quotation marks omitted). Despite this command, Plaintiff has regrettably made it necessary to say that which should go without saying: court orders that punish and restrict political speech are contrary to the public interest, impose substantial costs on the electorate, and are appropriate (if ever) only in the most dramatic of circumstances.

**B. Polling Place Observation Is a Protected Right Under Arizona Law.**

The vague injunction Plaintiff seeks is also infirm because it is likely to dissuade citizens from exercising their rights under Arizona law, and threatens to interfere with the State's orderly management of the election.

To the extent Plaintiff's requested injunction extends beyond merely ordering Defendants to comply with Arizona law, the injunction contemplates relief that would infringe rights the parties and indeed all Arizonans enjoy. Voting procedures are highly regulated; Arizona has codified an extensive framework of rules governing voting. Yet Plaintiff flaunts or ignores nearly all of them.

To start, many of Plaintiff's allegations focus on statements encouraging supporters to serve as "poll watchers." Complt. ¶ 23. But Arizona law expressly permits "[t]he county chairman of each party. . .[to] designate a party agent or representative and alternates for a polling place in the precinct who may act as challengers for the party which appointed him." Ariz. Rev. Stat. § 16-590(A). There is simply nothing impermissible about Defendants encouraging or facilitating Arizona supporters' exercise of their statutorily secured

prerogative to observe polling place proceedings.

Balancing the need for honest and open elections with the desire for a safe, orderly process, the Secretary of State requires each poll observer to produce a signed authorization letter evidencing his or her appointment by the county party chairman. *See* Arizona Secretary of State, <u>State of Arizona Elections Procedures Manual</u> (rev. June 2014) at 120.[2] Once appointed, an observer is entitled to remain in the polling place for the duration of voting hours and observers also may monitor proceedings at the central counting place, where ballots are processed and tallied. *Id.* at 120-21. Recognizing the critical interest in keeping our political process fair and transparent, Arizona imposes an array of restrictions and procedural safeguards on polling observation. Observers are strictly prohibited from handling ballots or voting materials or from engaging in any conduct that would "interfere with or impede the election procedures or staff." *Id.* at 121.

Measured against this regulatory backdrop, Plaintiff's claim that Defendants have "directed [their] supporters to engage in activity forbidden by Arizona state election law" by calling for supporters to serve as poll watchers (Complt. ¶ 64) is an invitation to punish lawful, political conduct. The State has enshrined poll observing as a means for ensuring trust in our election outcomes. Plaintiff provides no evidence that Defendants have done anything more than seeking to exercise this statutory right (or engage in other protected activity outside polling places). *See id.* ¶ 48 (quoting Governor Pence as stating, "I would encourage everyone within the sound of my voice, get involved, participate, be a poll worker on election day . . . be a part of that process, and uphold the integrity of one person one vote in America.").

Next, Plaintiff points to statements asking those in law enforcement to serve as poll watchers. *Id.* ¶ 25. But nothing in Arizona law prohibits law enforcement personnel from acting as poll observers in their personal capacities. Certainly Plaintiff is not suggesting that those best equipped to identify illegal activity should be enjoined from serving as poll

---

[2]     *Available at* https://www.azsos.gov/sites/azsos.gov/files/election_procedure_manual_2014.pdf

11

observers.  Nor could Plaintiff fairly suggest that police officers be banned from polling sites altogether simply because they are employed in law enforcement.

Plaintiff also complains that supporters allegedly have been encouraged to "travel en masse outside their counties of residence" to serve as poll observers.  Complt. ¶ 64.  In Arizona, however, political rights do not end at the county line.  Rather, *any* voter may be appointed to serve as a political party observer at any particular polling location designated by the county party chairman.  Ariz. Rev. Stat. § 16-590.  The notion that Defendants should be faulted for not manufacturing a county-based residency requirement for poll observers nowhere found in Arizona law is simply untenable.

Equally troubling is Plaintiff's suggestion that Defendants seek to depress voter participation by invoking concerns over potential voter fraud.  *See* Complt. ¶¶ 25-28. Regardless of whether Plaintiff believes voter fraud is real or imaginary, Arizona itself has enacted rules that voters must follow to ensure a fair election process.  For example, all voters appearing in-person at the polling place must furnish sufficient identification as a precondition to voting a regular (*i.e.*, non-provisional) ballot.  *See* Ariz. Rev. Stat. § 16-579(A).  In addition, "any qualified elector of the county"—not only an appointed poll observer—may challenge the eligibility of another elector.  *See* Ariz. Rev. Stat. § 16-591. Plaintiff repeatedly decries purported efforts to ensure that only citizens cast votes, *see* Complt. ¶¶ 34, 42, 53, but it is, of course, illegal for a non-citizen to vote.  *See* 18 U.S.C. § 611 ("It shall be unlawful for any alien to vote in any election."); Ariz. Rev. Stat. § 16-101(A)(1) (providing that only U.S. citizens are eligible to register to vote).  Recognizing as much, Arizona law permits voters presenting at the polling place to be challenged "as not qualified" Ariz. Rev. Stat. §§ 16-591, -121.01(B)(4), and articulates the precise procedure poll workers must follow to adjudicate the validity of the challenge and ensure that only duly registered electors are permitted to cast ballots.  *See id.* §§ 16-592 through -594.  Poll observers are entitled to verify whether these laws are being followed—and to notify elections officials (and if necessary, legal counsel) so that any violations of duly

enacted procedural requirements can be remedied. Yet the vague, far-reaching relief Plaintiff seeks threatens to infringe this right. *See* Complt. Prayer for Relief (e) (requesting injunction prohibiting "individuals . . . to be present at or around polling places . . . for the purpose or with the effect of intimidating voters or prospective voters").

Finally, Plaintiff seeks to infringe on Arizonans' First Amendment right to conduct exit polling. *See id.* Prayer for Relief (b) (requesting injunction prohibiting "exit polling" and "citizen journalist" initiatives). First and foremost, the Campaign and the ARP have no intention of conducting any exit polls—such that this issue is irrelevant as to them. But even if they did want to conduct exit polls, respectfully asking voters how they voted is a well-worn tradition in American politics that has become a staple of every election and that is, more importantly, protected by the First Amendment.

Hence, the Ninth Circuit invalidated on First Amendment grounds a statute that prohibited exit polling within 300 feet of a polling place as an impermissible content-based regulation of speech. *See Daily Herald Co. v. Munro*, 838 F.2d 380 (9th Cir. 1988). And a federal district court previously enjoined any effort to prohibit exit polling even within the 100 foot "buffer" zone at polling places. *See ABC v. Blackwell*, 479 F. Supp. 2d 719, 741, 744 (S.D. Ohio 2006). The court found that Ohio's loitering statutes "cannot be interpreted to prohibit exit polls within the 100 foot designated area around polling places without violating the First Amendment to the U.S. Constitution." *Id.* at 744. Exit polling "is a form of political speech," and "does not implicate the State's interests in preventing voter intimidation and fraud." *Id.* at 738. After all, "[b]y definition, exit polling affects only those who have already voted." *Id.*

Plaintiff cites no countervailing authority that would support a general ban on exit polling or other journalistic activities, particularly where such restrictions are placed on only one political party or campaign. That is because such conduct is protected by the First Amendment.

C.       **The Court Should Not Intervene in a Political Dispute Absent Specific Allegations of Concrete Misconduct.**

One final reason why injunctive relief is contrary to the public interest bears mentioning—such action would undermine trust in the judiciary. This case is one of four coordinated attacks across the country that are clearly long-planned efforts to sow chaos in the Defendant's political efforts, while garnering maximum publicity for Plaintiff's unsubstantiated, extraordinarily inflammatory claims on the eve of the Presidential Election. The Court should not permit Plaintiff to enlist it in that political crusade where, as here, Plaintiff has offered no allegations and presented no evidence of any actual misconduct by the Campaign or the ARP.

That is particularly true where, as here, Plaintiff is asking the Court to take sides on a hotly debated policy issue. Specifically, the Complaint is critical of those concerned with voter fraud and those who believe our political system is "rigged" to favor certain interests over others. In one form or another, these policy debates are long-running and legitimate ones. Defendants respectfully submit that whether those views are right or wrong is a political question that is not for the judiciary to decide. Indeed, a pervasive element of this lawsuit is the Plaintiff's attempt to use this Court as a forum for contesting the merits of public policy questions relating to voter fraud and irregularities, and to wield an injunction against these Defendants as a means of advancing their political position. Courts should be highly reluctant to silence the debate without concrete and compelling evidence that doing so is necessary. Here, no such evidence exists.

### III. Plaintiff Has Not Demonstrated a Strong Likelihood of Success.

Plaintiff similarly has not shown that it has any chance to prevail on the merits, much less a "strong" chance.

For one thing, as noted above, the order cannot be entered consistent with the First Amendment. *Supra* II.A. But even were that not the case, Plaintiff *still* fails to state a claim.

### A. The Activities of Roger Stone and Stop the Steal, Inc. Cannot Be Imputed to the ARP or the Campaign.

As an initial matter and as noted above, the Plaintiff relies heavily on alleged actions and statements by a certain Roger Stone and Stop the Steal, Inc. *See* Complt. ¶¶ 1, 9, 33-

14

38, 42, 58, 62.  There simply is no basis in fact or law, however, for ascribing or imputing Mr. Stone or Stop the Steal's activities to the ARP or the Campaign.  Mr. Stone and his organization are not employed by or affiliated with the other Defendants in any way.  The ARP and the Campaign have no knowledge of Mr. Stone and Stop the Steal's activities, and did not direct, control, authorize, approve, or consent to any of the statements or actions Mr. Stone and Stop the Steal are alleged to have undertaken.  Indeed, the Plaintiff has provided no evidence whatsoever that Mr. Stone or Stop the Steal are agents of the ARP or the Campaign.  The Complaint vaguely identifies Mr. Stone as a "political operative" and a "longtime associate" of Donald Trump, *id.* ¶ 9, but never adduces any factual basis for concluding that Mr. Stone and Stop the Steal's alleged conduct was carried out at the direction or behest—or even with the passive knowledge of—the ARP or the Campaign.  To invoke the alleged actions and statements of unrelated third parties as a basis for abrogating the rights or the ARP or the Campaign under the First Amendment and Arizona law defies law and logic.

> **B.     There Is No Evidence that the Campaign or the ARP Participated in a Conspiracy to Intimidate or Suppress Voters.**

While the Plaintiff expends much time and ink detailing alleged statements and conduct by third parties, there is simply no factual sustenance for the notion that the ARP or the Campaign have forged an agreement to intimidate or suppress Arizona voters.  As an initial matter, the Campaign has not controlled, directed or participated in the recruitment or training of any poll observers in Arizona.  Further, the ARP has explicitly and repeatedly instructed their poll observers to **<u>never engage</u>** in any course of conduct even remotely approximating voter suppression, and have at all times endeavored to ensure that supporters serving as poll observers punctiliously adhere to Arizona's laws.  Precisely to avoid confusion or misunderstandings of the law's demands, the ARP has hosted training classes for Arizonans who have volunteered to serve as polling place observers.  The training manual distributed at each class (attached as **<u>Exhibit A</u>**) provides the following unequivocal notice on the first page, in bolded print:

15

> **Republican Stand Against Voter Intimidation.** Our poll watchers help to make sure that election officials follow proper procedures both prior to and on Election Day, which protects the rights of all voters, regardless of party affiliation. We need to conduct ourselves in a way that provides no support for politically motivated allegations that our mere presence or the conduct of our legitimate activities somehow "intimidates voters." We must do our best to assure that no voter feels unwelcome or insecure as a result of anything that we do.

Exh. 1 at 1.   The manual later reiterates that observers "*should NEVER speak directly to the voters themselves or do anything that might disrupt the orderly conduct of the election.*" *Id.* at 3.   Observers monitoring drop-offs of early ballots polling places likewise are directed that they "*should NEVER confront the person dropping off the ballots,* [or] *do anything that might disrupt the orderly conduct of the election.*" *Id.*  Finally, even though poll observers are statutorily entitled to challenge the eligibility of particular voters, *see* Ariz. Rev. Stat. §§ 16-590, -591, the ARP has instructed poll observers to "***Not challenge a voter or address any voters directly***," and instead alert poll workers or legal counsel of their concerns.  Exh. A at 6.

"The essence of a conspiracy is a combination or agreement to violate or to disregard the law." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1549 (9th Cir. 1989); *see also* 15 Am. Jur. 2d Civil Rights § 153 ("The pleadings must specifically present facts tending to show agreement and concerted action").  When, as here, a plaintiff merely delineates a constellation of independent acts by different persons acting at different times and in different places, courts will not infer the subjective unity of purpose necessary to a viable claim of civil conspiracy. *See Weinstein v. Mortgage Capital Associates, Inc.*, 2:10-CV-01551-PMP, 2011 WL 90085, at *9 (D. Nev. Jan. 11, 2011) ("Plaintiff does not state when the conspiracy began or ended, the geographic scope of the conspiracy, what persons were involved, or any other facts supporting a meeting of the minds. Plaintiff does not allege facts which suggest Defendants would not have acted as they did absent a conspiracy.").   Rattling off a litany of alleged statements and actions by various putative

"Trump supporters" and other sundry third parties at various times in different locales simply does not, as a matter of law, establish a conspiracy by the ARP or the Campaign to engage in voter suppression. As discussed above, the ARP and the Campaign have taken scrupulous care to educate supporters serving as poll observers on the parameters of permissible conduct and to facilitate their compliance with them. Isolated instances evidencing poll observers' misunderstanding or disregard of these instructions—if and to the extent they occur at all—do not constitute a "meeting of the minds" to violate voting rights. *See Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir. 1999) ("To prove a civil conspiracy, the plaintiff must show that the conspiring parties 'reached a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement.'").

    **C.    The Plaintiff Has Not Pled a Valid Claim Under 42 U.S.C. § 1985(3)**.

    The Plaintiff's theory of relief under 42 U.S.C. § 1985(3) is premised on a fundamental misapprehension of the law. According to the Plaintiff, a *prima facie* claim under the statute requires only four elements, namely, "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." Motion at 21-22 (quoting *United Brotherhood of Carpenters & Joiners of Am. Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 828-29 (1983)).

    This is simply incorrect. While a variant of this standard still is the controlling rubric in cases alleging conspiracies by *government actors*, an entirely different doctrinal framework governs when, as here, the defendants are private persons not acting under any color of state law.[3] A decade after *Scott* was decided, the United States Supreme Court

---

[3]    As the Plaintiff appears to tacitly acknowledge, neither the Campaign, a private nonprofit corporation, nor the ARP is a "state actor." See *Johnson v. Knowles*, 113 F.3d 1114, 1118 (9th Cir. 1997) (holding that alleged discrimination by political party officers did not constitute "state action" for purposes of civil rights claim, noting that "[u]nder the

clarified that only a narrow ambit of private conspiracies are actionable under Section 1985(3). Specifically, the Court explained that "to prove a private conspiracy in violation of the first clause of § 1985(3), a plaintiff must show, *inter alia,* (1) that 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the conspirators' action,' and (2) that the conspiracy 'aimed at interfering with rights' that are 'protected against private, as well as official, encroachment.'" *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267–68 (1993). Neither element is satisfied here.

## 1. There Is No Evidence of "Racial Animus."

As a preliminary matter, it should be emphasized that Section 1985(3) consists, in relevant part, of two distinct provisions. The first makes actionable any conspiracy "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws" [the "Equal Privileges Clause"]. The second provides a cause of action for any conspiracy "to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress

---

law of this circuit, county central committees of political parties are private actors, not public agencies, even though they are regulated by the state," adding that "action taken by private individuals may be 'under color of state law' where there is 'significant' state involvement in the action."). More generally, courts have held political parties to be "state actors" when they are exercising governmental functions pursuant to statutory grants of authority—most notably, conducting primary elections. *See Smith v. Allwright*, 321 U.S. 649, 663 (1944) ("We think that this statutory system for the selection of party nominees for inclusion on the general election ballot makes the party which is required to follow these legislative directions an agency of the state in so far as it determines the participants in a primary election. The party takes its character as a state agency from the duties imposed upon it by state statutes; the duties do not become matters of private law because they are performed by a political party."). In most other situations, however, courts have been loath to ascribe state action to political parties. *See, e.g.*, *Vickery v. Jones*, 100 F.3d 1334, 1344 (7th Cir. 1996) ("The fact that the State Defendants acted in compliance with the 'rules and recommendations' of the [Republican] Party Defendants [when making hiring decisions] does not turn the Party Defendants' conduct into state action," and adding that there was no evidence that the political party had performed any traditional government functions); *Steigmann v. Democratic Party of Illinois*, 406 F. Supp. 2d 975, 980 (N.D. Ill. 2005) (political party not a state actor for purposes of Section 1983 claim alleging that political party had worked in concert with state officials to fire government employee because of his political affiliations).

18

of the United States; or to injure any citizen in person or property on account of such support or advocacy" [the "Support and Advocacy Clause"]. Despite the Plaintiff's efforts to conflate them, the distinction is material. Although the Plaintiff invokes the text of only the Support and Advocacy Clause in pleading its claims, that provision generally has not been recognized as encompassing purely private conspiracies; undersigned counsel's research has located no federal appellate decision extending the Support and Advocacy Clause's to alleged conspiracies involving only private actors. Notwithstanding the Plaintiff's attempt to import it into the Support and Advocacy Clause (*see* Motion at 22), the four-part test prescribed in *Scott* and modified in *Bray* recognizes only private conspiracies arising under the Equal Privileges Clause.

Assuming, *arguendo*, that a uniform doctrinal standard governs alleged private conspiracies under both provisions, however, the Plaintiff's Section 1985(3) is still fatally defective. The Complaint and Motion are devoid of any articulable evidence that the Defendants' alleged statements and actions were the product of racial animus. Indeed, the Complaint asserts that Mr. Trump's alleged comments encouraging citizens to serve as poll observers "are consistently directed at Democratic-leaning communities with large minority populations," Complt. ¶ 30, which confounds a vital distinction between a putative racial motivation and a partisan motivation. Courts have held consistently that private conspiracies predicated on political or partisan rationales are not actionable under Section 1985(3). *See, e.g.*, *Bretz v. Kelman*, 773 F.3d 1026, 1028 (9th Cir. 1985) (dismissing Section 1985(3) conspiracy claim, explaining that "[e]ven construing [the] complaint liberally, we cannot find an allegation of racial or class-based discrimination. [The plaintiff], therefore, cannot state a cause of action under the first clause of § 1985(3)."); *Farber v. City of Paterson*, 440 F.3d 131, 142 (3d Cir. 2006) ("Allowing § 1985(3) to reach politically motivated conspiracies would involve the federal courts in policing the political arena in ways that the drafters of § 1985(3) could not have intended."); *Grimes v. Smith*, 776 F.2d 1359, 1366 (7th Cir. 1985) ("[W]e join the conclusion of the Fourth Circuit . . . that §

1985(3) does not reach nonracial political conspiracies."). Crucially, the Plaintiff has adduced no statement, representation or conduct by either the ARP or the Campaign that plausibly evinces the "invidious racial animus" required under *Bray*. Indeed, the only statements bearing a racial cast proffered by the Plaintiff were made by random individuals on social media who claim to be "Trump supporters." *See* Complt. ¶¶ 54-56. These individuals do not have—and are not even alleged to have—any relationship or affiliation whatsoever with either the ARP or the Campaign; their views or words cannot, as a matter of law, be imputed to these Defendants.

### 2. Plaintiff Has Not Alleged the Violation of Any Right Protected Against Private Impairment.

Plaintiff's Section 1985(3) claim is defective for a second, independent reason. To maintain a cause of action against private actors, the Plaintiff must prove "an intent to deprive persons of a right guaranteed against private impairment." *Bray*, 506 U.S. at 274. Importantly, "[t]here are few such rights." *Id.* at 278. Federal courts have recognized two—and only two—constitutional rights amenable to enforcement against private actors, namely, (1) the Thirteenth Amendment's prohibition against slavery or involuntary servitude, and (2) the right of interstate travel. *See id.*; *see also Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1312 (11th Cir. 2010) ("When the alleged § 1985(3) conspirators are private actors, the plaintiff must demonstrate that the conspiracy was aimed at rights constitutionally protected against private impairment. . . . The only rights the Supreme Court has expressly declared enforceable against private conspirators under § 1985(3) are the right to interstate travel and the right against involuntary servitude."). The right to vote—which derives from the First and Fourteenth Amendments—accordingly is not a cognizable predicate for Section 1985(3) claims against private actors. *See Federer v. Gephardt*, 363 F.3d 754, 759–60 (8th Cir. 2004) (rejecting Section 1985(3) claim of political candidate who alleged his headquarters had been broken into and that he had been assaulted by political opponents, holding that "[p]assing the question of whether or not a political party is a 'class' under the statute, it is clear that the 'rights' involved here are solely First

Amendment rights. As such, they are not rights that are 'protected against both private and official encroachment.'"); *Brown v. Philip Morris Inc.*, 250 F.3d 789, 805 (3d Cir. 2001) (rejecting claim that tobacco companies undertook a racially based conspiracy, reasoning that "in the context of actions brought against private conspirators, the Supreme Court has thus far recognized only two rights protected under § 1985(3): the right to be free from involuntary servitude and the right to interstate travel. The instant case is distinguishable from the cases cited above because Black Smokers assert the deprivation of a different type of rights: those of property and contract.").[4]

More generally, this lawsuit encapsulates precisely the type of dispute federal courts have long eschewed as political warfare through judicial means. Expressing skepticism of the notion that Section 1985(3) could encompass non-racial conspiracies, the Supreme Court cautioned that such a proposition "would go far toward making the federal courts, by virtue of § 1985(3), the monitors of campaign tactics in both state and federal elections, a role that the courts should not be quick to assume. If [this] submission were accepted, the proscription of § 1985(3) would arguably reach the claim that a political party has interfered with the freedom of speech of another political party by encouraging the heckling of its rival's speakers and the disruption of the rival's meetings." *Scott*, 463 U.S. at 836. Mindful that "§ 1985(3) is not to be construed as a general federal tort law," *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1536 (9th Cir. 1992), courts have consistently turned a jaundiced eye toward quintessentially political disputes between private parties cloaked in the lexicon of civil rights. *See Grimes*, 776 F.2d at 1366 (holding that alleged private conspiracy to mislead voters by running a "sham" candidate was not actionable under Section 1985(3), reasoning that "this case presents a far greater danger that, in the words of *Scott*, § 1985(3)

---

[4] That the constitutional right to vote is also protected by statutory enactments against certain private interferences—such as the Voting Rights Act—does not salvage Plaintiff's claim. A Section 1985(3) plaintiff must demonstrate that the underlying right s/he seeks to vindicate is "*constitutionally* protected against private impairment." *Jimenez*, 596 F.3d at 1312 (emphasis added); *see also Brown*, 250 F.3d at 805 (noting that although the rights of property and contract posited by the plaintiffs do "entail freedom from discrimination by a private actor," they "are statutorily enacted, rather than of purely constitutional provenance, [and thus] they cannot be vindicated under § 1985(3)").

would provide 'a remedy for every concerted effort by one political group to nullify the influence of or do injury to a competing group by use of otherwise unlawful means'").

In sum, the Plaintiff has offered no evidence whatsoever that the ARP or the Campaign engaged in a conspiracy born of racial animus. In addition, because the right to vote is not constitutionally protected against impairment by private actors, it cannot undergird a Section 1985(3) claim against private persons such as the ARP and the Campaign. Accordingly, the Plaintiff's claim under the Ku Klux Klan Act fails as a matter of law.

### D. Plaintiff Has Failed to State a Valid Claim Under the Voting Rights Act.

Plaintiff's second cause of action fares no better. To prevail under Section 11(b) of the Voting Rights Act of 1965, a plaintiff must prove "(1) that there was an intimidation, threat or coercion, or an attempt to intimidate, threaten or coerce and (2) that the intimidation or attempt was for the purpose of interfering with the right to vote." *Am. Fed'n of State, Cty. & Mun. Employees, Council 25 v. Land*, 583 F. Supp. 2d 840, 846 (E.D. Mich. 2008); *see Olagues v. Russoniello*, 770 F.2d 791, 804 (9th Cir. 1985) ("[T]he organizations' claims under the Voting Rights Act against these officials do not appear to have merit. Assuming that the search of voting records intimidated bilingual voters, such intimidation would satisfy only one part of a two-pronged test for violations of [Section 11(b)]: the voters and organizations were intimidated, but the officials did not *intend* to intimidate."). Claims under this provision are exceedingly difficult to establish. *See United States v. Brown*, 494 F. Supp. 2d 440, 477 (S.D. Miss. 2007), *aff'd*, 561 F.3d 420 (5th Cir. 2009) (noting that the court itself "has found no case in which plaintiffs have prevailed under this section"); *Parson v. Alcorn*, 157 F. Supp. 3d 479, 498–99 (E.D. Va. 2016) (finding no likelihood of success on the merits).

Unsurprisingly, Plaintiff here fails to clear even the first hurdle. Its various allegations of "intimidation" are nothing more than legitimate exercises of free speech. Wearing shirts that happen to be red—a ubiquitous color carrying no particular political or

22

other connotation—plainly is not the kind of activity that inspired the statute. Conducting exit polling, *id.* ¶¶ 36-37, is a regular, harmless feature of the election-day process, and an entirely proper exercise of First Amendment rights. And Plaintiff itself admits that poll watching is a legal, statutorily sanctioned activity in Arizona, *id.* ¶ 65. These benign activities bear no resemblance to the conduct demonstrated in *Thune*—a case involving a concerted effort to follow a discrete class of voters (Native Americans) to record their license-plate numbers. *See Thune*, Dkt. No. 6. Moreover, even setting aside this problem, Plaintiff's claim under § 1971(b) also fails because Plaintiff offers no evidence that any of the alleged "intimidation" is animated by a "specific intent to intimidate, threaten, coerce, or attempt to do so to prevent a person from voting or attempting to vote." *Parson v. Alcorn*, 157 F. Supp. 3d 479, 498 (E.D. Va. 2016). Plaintiff's claim thus fails several times over.

In short, Plaintiff's claims lack both factual and legal support. And the relief Plaintiff requests would undoubtedly violate the First Amendment. For all these reasons, Plaintiff cannot meet its burden of showing a "'strong' likelihood of success on the merits." *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000).

## CONCLUSION

Defendants the ARP and Donald J. Trump for President, Inc. respectfully request that the Court deny the request for a temporary restraining order and injunctive relief.

Dated this 2nd day of November, 2016.

                                    STATECRAFT PLLC

                              By:   */s/ Kory Langhofer*
                                    Kory Langhofer
                                    Thomas Basile
                                    649 North Fourth Avenue, First Floor
                                    Phoenix, Arizona 85003

                                    *Counsel for Donald J. Trump for*
                                    *President, Inc.*

                                    TIMOTHY A. LA SOTA, PLC
                                    Timothy A La Sota, SBN # 020539
                                    2198 East Camelback Road, Suite 305
                                    Phoenix, Arizona 85016

                                    *Counsel for Arizona Republican Party*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 2, 2016, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Marc E Elias
Perkins Coie LLP
700 13th Streeet NW, Suite. 600
Washington, D.C. 20005-3960
melias@perkinscoie.com

Sarah Rae Gonski
Perkins Coie LLP
P.O. Box 400
Phoenix, Arizona 85001-0400
sgonski@perkinscoie.com

Michael Julian Gottlieb
Boies Schiller & Flexner LLP
5301 Wisconsin Aveenue NW, Ste. 800
Washington, D.C. 20015
mgottlieb@bsfllp.com

Dawn L Smalls
Boies Schiller & Flexner LLP
575 Lexington Avenue, Seventh Floor
New York, New York 10022
dsmalls@bsfllp.com

By: */s/* Kory Langhofer
Kory Langhofer

# Exhibit A

# ARIZONA REPUBLICAN PARTY
# POLL WATCHER'S MANUAL

## 2016 General Election

# **QUESTIONS/INCIDENT REPORTING**

# Arizona Republican Lawyers Association (AzRLA) Hotline: 1-888-680-6816

# AZGOP Incident Report: http://az.gop/edo/

**I.      INTRODUCTION.**

The purpose of our Republican poll watching program is to assure an honest and fair election.  We are proud that our poll watching program helps to protect the right of every <u>eligible</u> person to vote, and to have his or her vote counted.  Our program is carried out by volunteer poll watchers known as Party Representatives who are appointed by the County Chairmen.   To prepare themselves for this important role, Poll watchers should read this Manual carefully and attend a training session prior to the election.

**II.      GENERAL INSTRUCTIONS.**

A.      <u>**Republican Stand Against Voter Intimidation**</u>**. Our poll watchers help to make sure that election officials follow proper procedures both prior to and on Election Day, which protects the rights of all voters, regardless of party affiliation.  We need to conduct ourselves in a way that provides no support for politically motivated allegations that our mere presence or the conduct of our legitimate activities somehow "intimidates voters." We must do our best to assure that no voter feels unwelcome or insecure as a result of anything that we do.**

Since our efforts are primarily directed toward election officials, ***poll watchers should have little, if any, direct contact with voters***.  If we see anything improper, we should quietly bring this to the attention of the Election Board (Marshall or Inspector) and ask them to take

appropriate steps to correct the situation and report it via the AzRLA Hotline or the az.gop/edo site. However, sometimes a situation might arise which cannot be completely shielded from the voters. For example, a third party representative might try to get into an argument with the Republican representative in order to interfere with our activities. This can usually be resolved simply by asking the third party representative to step outside to discuss his or her concerns. It is also possible that an election official at the polling place might react badly to a suggestion and cause a scene that could disturb voters. If you ever find yourself in such a situation, even if you are within your rights and have done nothing wrong, we recommend that you withdraw and call the AzRLA Hotline for guidance or backup, rather than remaining in a situation that could result in allegations against you or the party.

B. <u>Equipment</u>. On Election Day, poll watchers must have in their possession at all times the letter(s) of appointment signed by their COUNTY CHAIRMAN; and should be equipped with a clipboard with pen, a cell phone, and a copy of this Manual.

C. <u>Work Periods</u>. While we hope that poll watchers will work all day on Election Day – from before 6:00 a.m., when the polls open, until after 7:00 p.m., when they close – we appreciate any amount of time you are able to volunteer, even if only a couple of hours. For poll watchers who can only work for half of Election Day, we request that you work over the lunch hour, that is, from before 6:00 a.m. until about 1:00 p.m., or from 12:00 p.m. until after 7:00 p.m., in order to provide additional coverage during this very heavy voting period.

The busiest voting times are before work in the morning, over the lunch hour and after work. Because so many people are voting during these periods, it is especially important not to do anything that could disrupt the voting process. On the other hand, it is all the more important to insist that proper procedures be followed during these peak periods, when lots of votes could be affected.

D. <u>Entering the Polling Place</u>. When entering a polling place, you should have your letter of appointment completely filled in, including your own name and the name of the precinct, if necessary ready to hand the Inspector of the Election Board. Your "precinct inspections check list", which is described below, may also be visible. All other equipment should be inside a bag or briefcase.

E. <u>Behavior</u>. ***Poll watchers should be polite and, as noted previously, should avoid confrontation whenever possible.*** You are required to comply with all legal orders of the Inspector of the Election Board. On the other hand, you may insist upon your right to be present and observe the voting process as a duly appointed Republican Party Representative.

## III. INSPECTION OF POLLING PLACES.

Attached as Exhibit A is a form entitled "Republican Poll Watcher's Precinct Inspection Checklist". This covers the most important things which you will need to check in order to assure that proper procedures are being followed at the polling place. Prior to Election Day, you should study the checklist carefully and read the statutory provisions that it refers to. ***Remember***

***to be polite and non-confrontational and to address all questions or comments to the Inspector or, with the Inspector's permission, to other members of the Election Board. You should NEVER speak directly to the voters themselves or do anything that might disrupt the orderly conduct of the election.***

## IV. VOTE HARVESTING LAW.

In 2016, Arizona enacted H.B. 2023, now codified at A.R.S. § 16-1005(H)-(I), which limits who may possess another's early ballot. While this law was challenged in the courts, the Federal Court ruled in favor of the law on September 23, 2016, thereby making this law official and enforceable. H.B. 2023 provides:

- A person who knowingly collects (gain possession or control of) voted or unvoted early ballots from another person is guilty of a class 6 felony. This law does not apply to the following permitted exemptions: An election official, a United States Postal Service worker or any other person who is allowed by law to transmit United States mail is deemed not to have collected an early ballot if the official, worker or other person is engaged in official duties;

- A family member, defined as a person who is related to the voter by blood, marriage, adoption or legal guardianship;

- A household member, defined as a person who resides at the same residence as the voter;

- A caregiver of the voter, defined as a person who provides medical or health care assistance to the voter in a residence, nursing care institution, hospice facility, assisted living center, assisted living facility, assisted living home, residential care institution, adult day health care facility or adult foster care home;

- An election held by a special taxing district formed pursuant to title 48 for the purpose of protecting or providing services to agricultural lands or crops and that is authorized to conduct elections pursuant to title 48.

If you see someone dropping off a large number of ballots (i.e., more than three), please immediately inform the Inspector or another member of the Election Board. Please ask the Inspector to fill out an incident report. Additionally, please report the incident to the AzRLA hotline immediately.

***You should NEVER confront the person dropping off the ballots, do anything that might disrupt the orderly conduct of the election, or potentially place you in risk of harm.*** If possibly, please take written notes on approximately how many ballots he/she dropped off, the physical characteristics of the person; and, if possible – and only while outside of the polling location –, get a picture of them or the license plate of their vehicle in the parking lot. It is important to remember that: (1) taking photographs/videos within the polling place is strictly forbidden; (2) you never put yourself in a potentially dangerous/risky/harmful situation; and (3) that voters do not perceive your actions to be intimidating.

## V.    INACTIVE VOTERS.

Prior to the election, the County Recorder has sent several letters to all voters.  When these are returned as undeliverable, the Recorder places the voter on a separate list of so-called "inactive voters".  These are registered voters, and the statute provides that, if they come to the polling place, they "shall be allowed to vote".  However, they should be questioned by the Inspector and must "affirm" that they still reside at the same address shown in the registration.  If so, they are allowed to cast a regular ballot.  However, if their answers show that they have moved within the same precinct, they are to cast a "provisional ballot" (see below), and if they have moved to a different precinct, they are to be sent to their new precinct to vote a provisional ballot there, unless they moved after the close of registration (29 days prior to the election).

## VI.    EARLY BALLOTS.

Voters who fail to mail their early ballots early enough to assure that they will arrive at county headquarters in time to be counted (7:00 p.m. on Election Day) may bring them in person (or send them via an "agent" in compliance with the provisions of H.B. 2023) to any polling place in the county.  A voter who brings in his/her unmarked early ballot may complete it at the polling place in lieu of turning it in to the Inspector and casting a provisional ballot.  The statute requires early ballots received at the polling place to be deposited inside a secured compartment in the main ballot or in a separate sealed ballot box, which will be transported to county headquarters for processing.

Sometimes voters who have mailed in their early ballot will still come to vote in person, because they are not sure their ballot will be delivered on time.  In some counties, anyone who comes in to vote at his/her polling place on Election Day and has received an early ballot is required to vote a provisional ballot.  In these counties, such voters will be allowed to cast a provisional ballot, which will not be counted if their early ballot was received on time.

In other counties (e.g. Maricopa County), if the County Election Department has not received the voter's Early Ballot by a certain day, the voter is allowed to cast a regular ballot at his/her assigned polling place and his/her Early Ballot will not be counted if later received.

## VII.    VOTER IDENTIFICATION

Before receiving a ballot, voters must show proof of identity at the polling place.  ***The information on the proof of identity must match the information in the precinct register in order to vote a regular ballot.***  The proof of identity may be: (a) one form of identification with the voter's name, address, and photograph (List 1); (b) two different forms of identification with the voter's name and address (List 2); or (c) a combination of the first two (List 3).

**A voter who is unable to show proof of identity shall receive a *conditional provisional ballot* (not just a provisional ballot) as described below.**

Voter Identification List 1

Acceptable forms of identification with name, address, and photo (one required) include:
- Valid Arizona driver's license
- Valid Arizona non-operating identification license
- Tribal enrollment card or other form of tribal identification
- Valid United States federal, state, or local government issued identification

(A student ID, credit card, U.S. Military identification without an address, and/or passport are not an acceptable form of identification for List 1)

Voter Identification List 2

Acceptable forms of identification with name and address (two required) include:
- Utility bill dated within 90 days of the election
- Bank statement dated within 90 days of the election
- Valid Arizona vehicle registration
- Indian census card
- Property tax statement of the voter's residence
- Tribal enrollment card or other form of tribal identification
- Vehicle insurance card
- Recorder's Certificate
- Valid United States federal, state, or local government issued identification, including a voter registration card issued by the county recorder
- Any mailing to the elector marked "Official Election Material" with the voter's name and address on it.

Voter Identification List 3

Acceptable combinations of identification include:

- Any valid photo identification from List 1 in which the address does not reasonably match the precinct register accompanied by a non-photo identification from List 2 in which the address does reasonably match the precinct register;
- U.S. Passport without address and one valid item from List 2; or
- U.S. Military identification without address and one valid item from List 2

(A student ID and/or a credit card are not an acceptable form of identification for List 2 or 3)

A voter who identifies himself or herself as a member of a federally recognized Native American tribe and who does not provide the identification described above may receive a *provisional ballot* upon presenting one form of tribal identification that bears the voter's name. A voter who

identifies himself or herself as a member of a federally recognized Native American tribe but does not present the identification described above or a form of tribal identification that bears the voter's name shall receive a *conditional provisional ballot*.

## VIII.   PROVISIONAL VOTING.

There are several circumstances under which a ballot cast at the polling place must be kept separate and not mixed with other ballots until it can be verified at county election headquarters.

A Voter shall receive a **provisional ballot** if:

(i)      The voter has been issued an Early Ballot (see Early Ballot section above),
(ii)     the voter's name does not appear on the signature roster or inactive list, and the voter has not moved,
(iii)    the voter has moved within the precinct,
(iv)     the voter has moved into a new precinct within the same county,
(v)      the voter has changed his or her name, or
(vi)     the voter is challenged at the polling place.

In the counties which require votes be cast at the polling location assigned specifically to the voter's voting precinct, ***if a voter casts a provisional ballot in the wrong polling location, it is likely that the vote will not be counted***.   While the voter is permitted to vote a provisional ballot, the election official should notify the voter of the likelihood the vote will not be counted unless it is cast at the correct polling location and redirect the voter to his/her correct polling location.

A Voter shall receive a **conditional provisional ballot** if:
(i)      the voter has not provided sufficient identification at the polling location,

In order for a conditional provisional ballot to be counted, the voter must provide proof of identification to the county recorder's office by 5:00 p.m. on the fifth business day after the election.   Conditional provisional ballots and provisional ballots must be kept separate.

Provisional ballots must not be mixed with the regular ballots but is to be placed in a separate sealed envelope and sent to county election headquarters.   The county recorder uses the information on the provisional ballot envelope to verify whether the voter is validly registered and eligible to vote, and has not voted another ballot.   If so, and if the voter's signature on the provisional ballot envelope matches the signature on the voter registration record, the ballot will be counted.   Conditional provisional ballots will not be verified until identification is provided.


## IX.      CHALLENGING PROCEDURE.

As a general rule, we do not challenge voters.   If you notice a problem, please let the Inspector know and/or call the AzRLA hotline if you cannot resolve the problem immediately. ***Do Not challenge a voter or address any voters directly.***

Grounds for Challenging:
1. The Voter has Moved.
2. That the person is not the person whose name appears on the register.
3. That the person is not a qualified registrant under A.R.S. §16-101, which requires that he:
   a. Must be a citizen of the US.  (This should not used as a ground for challenging without documentary proof of non-citizenship.)
   b. Must be at least eighteen years old.
   c. Must have been a resident of Arizona for twenty-nine days preceding the election.
   d. Must be able to write his name or make his mark, unless prevented from so doing by physical disability.
   e. Must not have been convicted of treason or a felony, unless restored to civil rights.
   f. Must not have been adjudicated an incapacitated person.


## X.  OTHER THINGS TO CONSIDER.

1. Poll watchers working on the morning shift should be present at a polling place prior to 6:00 a.m. to observe the process of setting up the voting equipment and opening the polls.  It is also important for poll watchers to be present at 7:00 p.m. when the polls close. Anyone in line to vote at that time should be allowed to cast his or her ballot.  Poll watchers may also wish to accompany the ballot boxes as they are transported from the polling places to county headquarters or other designated collection points.

2. If any election official intentionally fails or refuses to carry out his duties after you have specifically corrected him or explained the proper procedures, refer him to A.R.S. §16-1010 and submit a report via the az.gop/edo site or calling the AzRLA Hotline

3. Remember that advisors are available at the AzRLA Hotline which has been provided to you to help you either by phone or in person if necessary.  Be sure to call the AzRLA Hotline or submit an incident report at az.gop/edo immediately if you have any questions or problems that you are unable/not equipped to resolve yourself.

# REPUBLICAN POLL WATCHERS
## Precinct Inspection Checklist

If you see any of the following occurring, please report immediately to the Inspector and the AzRLA Hotline and/or az.gop/edo site:

1. "Electioneering" occurring within 75' of the front door

2. Anyone within 75' of the front door (including persons inside the polling place) other than voters <u>on business</u>, Inspector, Judges, Clerks, the Marshal, or party representatives.

3. The Election Board is not checking for proper identification.

4. Voters are not being give conditional provisional ballots if they do not have proper identification

5. Voters are not being give provisional ballots if:
   a. The voter has been issued an Early Ballot (see Early Ballot section above),
   b. the voter's name does not appear on the signature roster or inactive list, and the voter has not moved,
   c. the voter has moved within the precinct,
   d. the voter has moved into a new precinct within the same county,
   e. the voter has changed his or her name, or
   f. the voter is challenged at the polling place.

6. Provisional ballots are being placed in the ballot machine with non-provisional ballots;

7. If the voter is at the wrong precinct, the voter is not being told his provisional ballot will <u>not</u> be counted.

8. Someone drops off more than three Early Ballots at the polling location.

9. The wait to cast a ballot is more than 15 minutes

10. Any disruptions or anything else odd or unusual.

## **QUESTIONS/INCIDENT REPORTING**

Arizona Republican Lawyers Association (AzRLA) Hotline: 1-888-680-6816

AZGOP Incident Report: http://az.gop/edo/