Sarah R. Gonski (# 032567)
PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Telephone: (602) 351-8000
Facsimile: (602) 648-7000
SGonski@perkinscoie.com

Michael J. Gottlieb (Admitted *Pro Hac Vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave, N.W.
Washington, DC  20015
Tel: (202) 237-2727
Fax: (202) 237-6131
mgottlieb@bsfllp.com

*Attorneys for Plaintiff Arizona Democratic Party*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Arizona Democratic Party, | No. CV-16-03752-PHX-JJT |
| Plaintiffs, | |
| v. | **PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION** |
| Arizona Republican Party, Donald J. Trump for President, Inc., Roger J. Stone, Jr., and Stop the Steal, Inc., | |
| Defendants. | |

Plaintiff Arizona Democratic Party submits this Reply in response to Defendant Arizona Republican Party and Donald J. Trump For President, Inc.'s Response filed November 2, 2016 (Doc. 15). As demonstrated below: (1) Defendants have engaged in conduct that constitutes voter intimidation as a matter of law, (2) Section 11(b) proscribes acts that have the *effect* of intimidating voters, notwithstanding a defendant's subjective intent, (3) The Klan Act does not require proof of racial animus, and (4) The First Amendment does not protect acts constituting voter intimidation.

## I.   DEFENDANTS HAVE PUBLICLY CALLED FOR THEIR SUPPORTERS TO ENGAGE IN VOTER INTIMIDATION

As detailed in the Complaint, Donald J. Trump has repeatedly called for his supporters—in Arizona and elsewhere—to "watch other communities because we don't want this election stolen from us." Compl. ¶ 27.  Trump has made clear that the "other" communities to which he refers are urban areas comprised largely of Democratic-leaning and minority voters. *See id.* ¶¶ 21-30.  At an October 29 rally in Phoenix, for example, Trump claimed the election is "rigged" because of "voter fraud," and instructed his supporters to "watch, watch, be careful, watch." *Id.* ¶ 28.  The Trump Campaign has instructed its surrogates to "make points on rigged system" and claim, without any evidence, that there has been "an increase in unlawful voting by illegal immigrants." *Id.* ¶ 53.  ARP Chair Robert Graham and ARP official spokesman Tim Sifert have followed suit, publicly encouraging Trump supporters who suspect voter fraud "to follow voters out into the parking lot, ask them questions, take their pictures and photograph their vehicles and license plate." *Id.* at ¶¶ 49-51 (Sifert calling for "good citizens" who suspect voter fraud "to do something about it," by approaching voters outside the polls, question them, and take pictures and videos of them and their vehicles).  Graham has recently stated publicly that Donald Trump's warnings that the election could be rigged has prompted "probably over a thousand poll watchers" to volunteer, far exceeding the 150 volunteers in past elections.  Declaration of Sarah R. Gonski at Ex. 1 (*Questions Build Over Line Between Fraud Prevention And Voter Intimidation At The Polls In Arizona*, KJZZ.org (November 3, 2016)).  According to Graham, "I mean, we really are having a hard time making sure they go through the training properly." *Id.*  Even with potentially inadequate training, Graham "it's a good thing for all the parties to have observers in the polls" because "[t]his way people just know a little bit more that they're being watched."

ARP and Trump nowhere even mention in their brief these public statements by Trump, Graham and others encouraging Trump supporters to "watch," "follow," "question," and "take pictures of" persons in "other communities" who they claim are

likely to engage in voter fraud.  These statements describe textbook examples of the kind of voter intimidation proscribed by Section 11(b) and the Klan Act.  *See* Gonski Decl. at Ex. 13 (*Daschle v. Thune*, TRO, Civ. 04-4177 (D.S.D., Nov. 1, 2004) (entering TRO barring Republican state party, Republican Senate candidate and their supporters from, inter alia, following voters outside polling places and writing down their license plate numbers).  In *United States v. Tan Duc Nguyen*, for example, the Ninth Circuit considered a Republican candidate for Congress who mailed a letter to 14,000 voters with Hispanic surnames that merely explained that voting is a crime if the recipients were "in this country illegally."  673 F.3d 1259, 1261 (9th Cir. 2012).  The Ninth Circuit agreed this mailing constituted voter "intimidation" under an analogous provision of California law, because it could reasonably "constitut[e] a tactic of coercion intended to induce its recipients to refrain from voting."  *Id.* at 1266.  The Ninth Circuit rejected defendant's argument that voter intimidation requires proof of direct confrontations or threats, holding that voter intimidation "can be achieved through manipulation and suggestion" and through "subtle, rather than forcefully coercive means."  *Id.* at 1265.

## II.   PROOF OF PAST VIOLATIONS IS NOT REQUIRED FOR PRELIMINARY RELIEF

As just demonstrated, by calling on their supporters to "watch" and harass voters in urban, Democratic-leaning, largely minority communities, Defendants have already engaged in "subtle" forms of voter intimidation proscribed by Section 11(b) and the Klan Act.  But even if this were not the case, Defendants are wrong that preliminary relief is only warranted *after* there have been direct—and possibly violent—confrontations between voters at the polls.  At minimum, Defendants' statements give rise to the credible threat that voter intimidation will occur at polling places in Arizona on Election Day.

In determining whether to issue a preliminary injunction, courts do not require plaintiffs to "await the consummation of threatened injury to obtain preventive relief." *Libertarian Party of Los Angeles Cty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013) (citing *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, (1979)).  Instead, given

1   the forward-looking nature of injunctive relief, courts "must evaluate the likelihood of
2   *future* . . . violations, and thereby determine whether an injunction is needed."  *United*
3   *States v. Schiff*, 379 F.3d 621, 625 (9th Cir. 2004); *see Nat'l Wildlife Fed'n v. Burlington*
4   *Northern R.R., Inc.*, 23 F.3d 1508, 1511 (9th Cir.1994) (to be entitled to an injunction
5   under the Endangered Species Act, movant must "make a showing that a violation of the
6   ESA is at least likely in the future.").  Accordingly, where the statute in question does not
7   expressly require evidence of past violations for the issuance of preliminary injunctive
8   relief, courts are permitted to issue such relief based on the likelihood that "is about to
9   violate" the statute. *F.T.C. v. Evans Prod. Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985) ("the
10  statute does not mention past violations"); *see Commodity Futures Trading Comm'n. v.*
11  *Frankwell Bullion Ltd.*, No. C-94-2166 DLJ, 1994 WL 449071, at *1 (N.D. Cal. Aug. 12,
12  1994) (where "an injunction [is] authorized by statute, the government need only show
13  that the statutory conditions are met, *i.e.* that it is likely to succeed on the merits, and that
14  there is a reasonable likelihood of future violations.").
15      The credible threat that Defendants will engage in future violations of law is
16  sufficient to establish irreparable injury warranting preliminary injunctive relief.  *See Park*
17  *Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1159 (9th Cir.
18  2011) ("Defendants' threat to evict Plaintiffs created a likelihood of irreparable harm in
19  the absence of an injunction barring future evictions," even though no evictions had
20  actually been commenced or effectuated).  In *Tucson Women's Ctr. v. Arizona Med. Bd.*,
21  666 F. Supp. 2d 1091 (D. Ariz. 2009), for example, the Court granted a preliminary
22  injunction enjoining a restriction on abortion based on evidence that the challenged
23  restriction "would have made abortions impossible" for some women—*had* they sought
24  an abortion when that restriction was in effect.  *Id.* at 1100.  The Court did not require
25  proof that the regulation in question had actually inhibited constitutionally protected
26  conduct before issuing preliminary relief.  *See id.* ("The Court's task in ruling on
27  Plaintiffs' preliminary injunction motion is to determine a future likelihood of harm").
28  Proof of previous violations of law is neither necessary nor sufficient to entitle a party to

injunctive relief.  Instead, a party must "demonstrate the prospect of future harm," by whatever competent evidence available in the record.  *Gonzalez-Droz v. Gonzalez-Colon*, 573 F.3d 75, 79 (1st Cir. 2009); *see United States v. An Article of Drug,* 661 F.2d 742, 746-47 (9th Cir.1981) (approving preliminary injunction which prohibited arguably legal conduct in order to "bar future violations that [were] likely to occur."); *United States v. Oregon State Medical Soc.*, 343 U.S. 326, 333 (U.S. 1952) ("The sole function of an action for injunction is to forestall future violations.").

## III.   PLAINTIFF DOES NOT HAVE TO PROVE RACIAL ANIMUS IN ORDER TO PREVAIL ON ITS CLAIMS

At the outset, it bears noting Defendants have not asserted that proof of racial animus is necessary to state a claim under Section 11(b) of the Voting Rights Act.  *See* Resp. at 17-23.  Nor could they.  Section 11(b) was drafted specifically to prohibit acts that have the *effect* of voter intimidation, notwithstanding whether a defendant subjectively intended this result.[1]  Nothing in the text or legislative history of Section

---

[1] When Congress passed Section 11(b), it intended to depart from the then-existing intimidation provision in the Civil Rights Act of 1957, Section 131(b), which required a showing that the defendant had "the purpose of interfering with the right . . . to vote."  52 U.S.C. § 10101(b).  Section 11(b), by contrast, has no such explicit language requiring a particular *mens rea*.  52 U.S.C. § 10307(b); *see* H.R. Rep. No. 89-439, at 30 (1965) (unlike Section 131(b), "no subjective purpose or intent need be shown"), *as reprinted in* 1965 U.S.C.C.A.N. 2462.  As Attorney General Nicholas Katzenbach testified during hearings on the Voting Rights Act:  "Perhaps the most serious inadequacy results from the practice of district courts to require the Government to carry a very onerous burden of proof of 'purpose.'  Since many types of intimidation . . . involve subtle forms of pressure, this treatment of the purpose requirement has rendered the statute largely ineffective."  Voting Rights: Hearings on H.R. 6400 Before the Subcomm. No. 5 of the H. Comm. On the Judiciary, 89th Cong. 9 (1965).  As a result, Katzenbach concluded, "defendants [sh]ould be deemed to intend the natural consequences of their acts."  Voting Rights, Part 1: Hearings on S. 1564 Before the S. Comm on the Judiciary,  89th Cong. 16 (1965).

In *Daschle v. Thune*, for example, a federal district court entered a TRO prohibiting a Republican state party, a Republican Senate candidate, and their supporters from engaging in conduct that could reasonably intimidate voters—namely, following them in and around polling places, talking loudly about voter fraud, and writing down their vehicle's license plate numbers.  *See* Gonski Decl. Ex. 13 (TRO at 1-2, Civ. 04-4177 (D.S.D., Nov. 2, 2004)).  The Court explicitly held that proof of intent to engage in voter

11(b) indicates that claimants must demonstrate a defendant intended for its actions to intimidate voters—let alone that a defendant's conduct was driven by racial animus. *See* 52 U.S.C. § 10307(b) ("No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote.")

Even Defendants' limited argument that racial animus is required to state a claim for voter intimidation under the Klan Act, 42 § 1985(3) fails. *See* Resp. 16. Examination of the plain text of Section 1985(3) and the cases that Defendants themselves cite in their brief demonstrates the error of Defendants' position.

Defendants are of course correct that the Supreme Court held in *Bray v. Alexandria Women's Health Clinic* that a showing of "some racial . . . or otherwise class-based[] invidiously discriminatory animus" and an injury to a right "protected against private . . . interference" is necessary to prove a Section 1985(3) claim—when, that is, the claim arises under Section 1985(3)'s *first* clause. *See* Resp. 16 ("Specifically, the Court explained that 'to prove a private conspiracy *in violation of the first clause* of § 1985(3).'") (quoting *Bray*, 506 U.S. at 267-68); *see also Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971) (interpreting Section 1985(3)'s first clause). But Section 1985(3) has *three* clauses. As Plaintiff has made abundantly clear in its Complaint and Motion, Plaintiff's claim arises under Section 1985(3)'s *third* clause.

Under the plain text of Section 1985(3), that distinction makes all the difference. Section 1985(3) makes actionable three kinds of conspiracies:

> **[Clause 1]** If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; **[Clause 2]** or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or

intimidation is unnecessary to succeed on a Section 11(b) claim: "Whether the intimidation was intended or simply the result of excessive zeal is not the issue, as the result was the intimidation of prospective Native American voters." *Id.*

1
2
3
4
5

> Territory the equal protection of the laws; **[Clause 3]** or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; . . . the party so injured or deprived may have an action . . . .

6
7
8
9
10
11
12
13
14
15
16
17

42 U.S.C. § 1985(3). As the Supreme Court has said of the first two clauses, "The language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin*, 403 U.S. at 102. But as is clear from the statutory text, Section 1985(3)'s third clause works differently. Instead of referring to the denial of "equal protection," the third clause refers to private conspiracies "to prevent by force, intimidation, or threat" a lawful voter from exercising his or her right to vote. The statutory text therefore indicates that as long as a conspiracy exists whose goal is to "prevent by . . . intimidation" any lawful voter from voting, an action lies under Section 1985(3)'s third clause. In other words, unlike the first two clauses of Section 1985(3), the third—"support and advocacy"—clause does not require a showing of racial animus.

18
19
20

The Supreme Court has read Section 1985(3) in exactly this way. In *Kush v. Rutledge*, 460 U.S. 719, 726 (1983), the Court explained that § 1985 as a whole "outlaw[s] five broad classes of conspiratorial activity." *Id.* at 724. They are:

21
22
23
24

> conspiracies that interfere with (a) the performance of official duties by federal officers; (b) the administration of justice in federal courts; (c) the administration of justice in state courts; (d) the private enjoyment of "equal protection of the laws" and "equal privileges and  immunities under the laws"; and (e) the right to support candidates in federal elections.

25
26
27
28

*Id.* The *Griffin* Court had held that the fourth type of conspiracy—which corresponds to the first two claims recognized by § 1985(3)—required a showing of "invidiously discriminatory animus." These types of conspiracies, which focus on the deprivation of rights guaranteed against the states, must "aim at a deprivation of the equal enjoyment of

rights secured by the law to all." *Griffin*, 403 U.S. at 102.  Defendants argue—without apparently noticing that Plaintiff has not brought a claim under either of the first two clauses of Section 1985(3)—that this requirement applies to Plaintiff's claim.  But as the *Kush* Court explained, Section 1985's five "broad categories" are not created equal:

> Three of the five broad categories, the first two and the fifth, relate to institutions and processes of the federal government-federal officers, § 1985(1); federal judicial proceedings, the first portion of § 1985(2); and federal elections, the second part of § 1985(3). The statutory provisions dealing with these categories of conspiratorial activity contain no language requiring that the conspirators act with intent to deprive their victims of the equal protection of the laws. Nor was such language found in the corresponding portions of § 2 of the 1871 Act.

*Id.* at 724-25. The *Kush* Court, construing the elements of a conspiracy under the first part of Section 1985(2)—which the Court directly analogized to Section 1985(3)'s third clause—pointed out that *Griffin* had found a "class-based animus" requirement while explicitly confining its analysis to the first type of § 1985(3) conspiracy.  *Id.* at 726. Section 1985(2)'s first part, like Section 1985(3)'s third clause, required a different analysis. There was no basis in precedent or legislative history, the Court explained, for finding a "class-based animus" requirement in the "three of the five broad categories" of conspiracies that "relate to institutions and processes of the federal government," including Section 1985(3).  *Id.*  More importantly, "the statutory language that provides the textual basis for the 'class-based, invidiously discriminatory animus' requirement simply does not appear in the portion of the statute" that the Court was reviewing. *Id.* That is precisely the case here.  *Kush* compels the conclusion that Section 1985(3)'s third clause makes actionable any conspiracy to interfere with a lawful voter's right to vote in a federal election.

Defendants cite several cases that purportedly support an opposite conclusion. They do not. With a single exception, every one of Defendants' authorities is actually a case interpreting Section 1985(3)'s first two clauses.  *See* Resp. at 17-22.  That should be no surprise, since none of those cases concern *federal* elections (and indeed, several do

1  not concern elections at all). In the sole exception, *Federer v. Gephardt*, 363 F.3d 754

2  (8th Cir. 2004), the Eighth Circuit held that while a plaintiff did not need to show racial

3  animus to prevail on a claim under Section 1985(3)'s third clause, a plaintiff did need to

4  prove an injury to a right protected against private interference. In that case, the plaintiff

5  had alleged that a campaign headquarters break-in had interfered with his right to support

6  his own candidacy for congressional office. The Eighth Circuit concluded that only the

7  First Amendment protected that right, and to bring private interference with it under

8  Section 1985(3)'s coverage would be tantamount to eliminating the First Amendment's

9  state action requirement. *See id.* at 758-60. The Eighth Circuit has similarly held that

10 Section 1985(3)'s third clause does not protect the right to fundraise for a candidate for

11 federal office. *Gill v. Farm Bureau Life Ins. Co. of Missouri*, 906 F.2d 1265 (8th Cir.

12 1990). However, the court recognized that Section 1985(3)'s third clause *would* protect a

13 plaintiff from private interference with at least one right in federal elections: the right to

14 vote. *Id.* at 1270.[2]

15        The law is clear. No showing of racial animus is necessary for Plaintiff to prevail

16 on a claim under the third clause of Section 1985(3). The text of Section 1985(3) could

17 not be clearer that if a plaintiff is injured in any way by an act in furtherance of a

18 conspiracy to interfere with his or her right to vote in a federal election, that plaintiff can

19 recover against the conspiracy—meaning, against each and every one of the conspirators.[3]

20

21        [2] Plaintiff has brought this action to protect the rights of individual voters to vote in
   the 2016 federal election free of intimidation or interference. Defendants have never
22 disputed that Plaintiff has standing to litigate on those voters' behalf to vindicate those
   rights.

23        [3] Indeed, although Defendants argue that applying Section 1985(3) as written would
   turn it into a "general federal tort law," and make federal courts the "monitors of . . . *both
24 state and* federal elections," Resp. at 21 (emphasis added), they do so while relying on
   case law interpreting Section 1985(3)'s first two clauses as applied to non-federal
25 elections, or outside the election context entirely. *See United Bhd. Of Carpenters &
   Joiners of Am., Local 610 v. Scott*, 463 U.S. 825 (1983) (labor protest); *Sever v. Alaska
26 Pulp Corp.*, 978 F.2d 1529 (9th Cir. 1992) (employment and contract dispute); *Grimes v.
   Smith*, 776 F.2d 1359 (7th Cir. 1985) (city court election). In such cases, it is true enough
27 (although irrelevant here) that federal courts cannot invoke Section 1985(3)'s ban on
   interference with the equal protection of the laws unless there is a lawful basis for
28 enforcement of a *federal* right in *state and private* contexts. Those concerns are
   inapplicable to Section 1985(3)'s third clause—which, in any event, could never apply to

## IV.   THE FIRST AMENDMENT IS NOT A BAR TO INJUNCTIVE RELIEF AGAINST UNLAWFUL VOTER INTIMIDATION

Defendants' First Amendment arguments are meritless, as Plaintiff's sought relief is narrowly tailored toward Defendants' specific calls and support for supporters to violate federal and state law.  In *United States v. Tan Duc Nguyen*, discussed *supra*, the Ninth Circuit rejected a similar First Amendment argument brought a Republican congressional candidate who engaged in voter intimidation by sending "subtle" threats in a direct mailing to voters.  673 F.3d 1259, 1261 (9th Cir. 2012).  Nguyen argued that "his letter was political speech," but the Ninth Circuit recognized that intimidation of voters "may be regulated by the state without running afoul of the First Amendment. . . .  If the targeted distribution of the letter by Nguyen's campaign falls within this prohibition, then it is speech that is proscribable under the First Amendment."  *Id*; *compare* Def. Resp. 7-8 (suggesting such conduct would be immunized).

Defendants' citations to two inapposite cases do not insulate them from liability for intimidating voters.  In *Daily Herald Co. v. Munro*, the Ninth Circuit upheld exit polling against a 300-foot bar where the exit pollers were media organizations and the evidence showed that "the media plaintiffs conducted their polling in a 'systematic and statistically reliable manner.'"  838 F.2d 380, 383 (9th Cir. 1988); *see id.* at 389 (Reinhardt, J., concurring) (writing "separately . . . to emphasize" the fact that the statute at issue restricted the "media").  By contrast, Stone and Stop the Steal do not run a legitimate exit-polling operation, as Plaintiff's expert Mellman establishes.  *See* Expert Report and Declaration of Mark S. Mellman.[4]  Defendants Stone and Stop the Steal have not even

---

state and local elections, or "general . . . tort claims"—because, as the Supreme Court made clear in *Kush v. Rutledge*, Section 1985(3)'s third clause enforces a federal right to vote in *federal* elections. 460 U.S. at 724-26.

[4] Defendants' purported polling exercise serves no legitimate purpose.  The expert report of noted polling expert and public opinion researcher Mark S. Mellman, which draws upon 34 years of his experience in the field, establishes that Stone's operation is a sham.  *See* Expert Report and Declaration of Mark S. Mellman.  Mellman "routinely design[s] and implement[s] polls to project the results of elections" and "perform[s] polling and surveys for public interest organizations . . . as well as for corporate clients.

1    taken minimal steps to ensure the reliability or accuracy of their purported exit poll.  *Id.* at

2    1.  Most important, there was *no allegation* in *Munro* that the exit-polling operations were

3    a pretext for voter intimidation.   Indeed, *Munro* recognized the compelling interest in

4    "maintaining peace, order, and decorum at the polls and preserving the integrity of their

5    electoral process," which Defendants threaten by virtue of their planned intimidation

6    tactics.  838 F.2d at 385.  *Munro* struck down a statute that "prohibit[ed] all exit polling,

7    *including nondisruptive exit polling*"—here, Defendants intend to use their exit-polling

8    operation as a smoke screen for a scheme of intimidation and harassment of lawful voters

9    to suppress turnout.  *ABC v. Blackwell* is inapposite for similar reasons: the suit was

10   brought by media organizations engaged in a bona fide, scientifically valid exit-polling

11   operation, and there was no allegation of an attempt to intimidate voters or any such

12   effect.  479 F. Supp. 2d 719, 721-22, 739 (S.D. Oh. 2006).

13         Contrary to Defendants's assertion, the constitutional value that is truly at stake in

14   this litigation is the "right to vote freely for the candidate of one's choice"—"the essence

15   of a democratic society."  *Reynolds v. Sims*, 377 U.S. 533, 555 (1964).  The Supreme

16   Court has rejected the argument Defendants raise here—that there is "an absolute right to

17   speak to potential voters at any location."  *Piper v. Swan*, 319 F. Supp. 908, 910 (E.D.

18   Tenn. 1970) (cited in *Burson v. Freeman*, 504 U.S. 191 (1992)).  The Supreme Court,

19   *Id*. at 1.  Based on his examination of publicly-available sources on Stone's purported
20   exit-polling operation, including materials and videos in which Stone describes the
21   operation in his own words, Mellman concluded as follows:

22         [I]t is my conclusion that the "Exit Poll" that Roger Stone purports to be
             employing in the 2016 General Election is not in keeping with the accepted
23           methodology, purpose, or practices in this field.  The polling that he plans to
             conduct is unlikely to produce unbiased, reliable results, and, moreover,
24           does not appear to be designed to meet such ends.  Mr. Stone's effort seems
             oblivious to the fundamental techniques accepted throughout the industry as
25           based on reliable principles and methods, as well as very basic well-known
             facts about exit polling.  Given Mr. Stone's stated political biases and the
26           methodology he has employed—i.e., targeting Democratic and minority
             precincts—his exit polling strategy appears only designed to intimidate
27           voters in an attempt to influence the election and suppress the vote.  *Id.*

28

rather, has recognized the "compelling interest in protecting the right of [U.S.] citizens to vote freely for the candidates of their choice." *Burson*, 504 U.S. at 198.  *See also Republican Party of Pennsylvania v. Cortés*, No. 16-cv-05524-GJP, at 13, 26 (E.D. Pa. Nov. 3, 2016) (Pennsylvania's restrictions on poll-watching activity "places no burden on . . . constitutional rights;" assertions that "statements made in one's capacity as a poll watcher constitute core political speech is meritless"). As Plaintiff explained in its opening brief, Defendants are unfolding a deliberate and dangerous scheme to deprive voters, including in Nevada, of their right to exercise the franchise free from intimidation and coercion.  Pursuant to clearly established principles of federal law, they must not be allowed to continue with their flagrantly anti-democratic conduct.

## V.   THIS CASE DOES NOT PRESENT A 'POLITICAL QUESTION' FROM WHICH COURTS SHOULD ABSTAIN

Defendants urge the Court to break faith with its judicial duty by suggesting that a suit to vindicate federal laws that plainly bar voter intimidation amounts to a "political question that is not for the judiciary to decide."  Resp. at 14.  Defendants argue that Plaintiff—and the thousands of Arizona voters threatened by tactics designed to intimidate, harass, and coerce—are without any judicial recourse.  It is not surprising that Defendants fail to cite a single authority for that untenable proposition.  Far from "undermin[ing] trust in the judiciary," *id.* at 12, the regular operation of the courts in the midst of Defendants' attempts to sully the democratic process is what is needed to maintain public trust in our institutions.  In any event, this case fulfills none of the criteria for a political question.  *See Baker v. Carr*, 369 U.S. 186 (1962).

## VI.   CONCLUSION

The Court should grant Plaintiff's motion for a temporary restraining order and/or preliminary injunction.

1

                                            Respectfully submitted,

2

3   Dated:  November 3, 2016          s/ *Michael J. Gottlieb*

4                                             Michael J. Gottlieb
                                              BOIES, SCHILLER & FLEXNER LLP

5                                             5301 Wisconsin Avenue, N.W.
                                              Washington, D.C.  20015

6                                             Telephone:  (202) 237-2727
                                              Facsimile:  (202) 237-61341

7                                             MGottlieb@bsfllp.com

8                                             Sarah R. Gonski (# 032567)
                                              PERKINS COIE LLP

9                                             2901 North Central Avenue, Suite 2000
                                              Phoenix, Arizona  85012-2788

10                                            Telephone:  (602) 351-8000
                                              Facsimile:  (602) 351-7000

11                                            SGonski@perkinscoie.com

12                                            *Attorneys for Plaintiff Arizona Democratic Party*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2      I hereby certify that on November 3, 2016, I electronically transmitted the attached

3   document to the Clerk's Office using the CM/ECF System for filing and a Notice of

4   Electronic Filing was transmitted to counsel of record.

5

6                *s/ Sarah R. Gonski*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28